**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA       :
                                  :

          v.                   :       Case No. 21-CR-725 (MAU)

                                  :

JARED SAMUEL KASTNER,       :

                           :

     Defendant.             :

**DEFENDANT JARED KASTNER'S RESPONSE TO GOVERNMENT'S SENTENCING MEMO AND OBJECTION TO SELECTIVE PROSECUTION.**

Defendant Jared Samuel Kastner ("Kastner") by undersigned counsel, with this Response and objection to the government's selective prosecution, as exemplified by the government's sentencing memo (ECF 194).

Once again, the government seeks a maximum possible sentence in a January 6 case, against a defendant with zero criminal history points, a new husband and father of a newborn child. It is obvious that the Biden/Harris Justice Department seeks these maximum penalties for political reasons; in order to bolster the Harris presidential campaign in the upcoming November elections.

In general, January 6 sentences are **the most severe sentences in U.S. history relating to any political protest, demonstrations, or riots.** In fact the longest January 6 prison sentences are several times harsher than sentences which

law schools once taught were the most unjust political sentences in history for political demonstrations. C.f., Peter Richardson, "Democracy's Prisoner: Eugene V. Debs, the Great War, and the Right to Dissent' by Ernest Freeberg," *LA Times*, June 15, 2008 (saying Eugene V. Debs' "10-year sentence raised 1st Amendment issues with unprecedented force").

**The government's deceptive memorandum.**

Ridiculously, the government points to evidence of Kastner's law-abidingness as if such evidence is an aggravating factor.  (If anything, such evidence is a mitigating factor.) "As detailed below," writes the government, "Kastner later testified that he brought a firearm with him from Ohio and that he *contemplated bringing a firearm* with him to the rally, but Kastner *denied* bringing any firearms into the District of Columbia on January 6."  The government also describes Kastner's typical khaki pants—sold at J.C. Penney and worn by millions—as "tactical pants."

This is deceptive language, in bad faith.  The government buries the truth in its footnote, wherein the government admits that after Kastner researched firearm laws in the District of Columbia, Kastner did not bring any firearms into the District, "consistent with his testimony."

**Punishing Kastner for defending himself.**

The government also seeks to take as a "fine" the funds which Kastner has raised for his legal defense.  Kastner objects to this obvious 6th amendment and 1st amendment violation.

**Severe sentencing Disparities between "Left Wing" and "Right Wing" Rioters Have Emerged—Which are Anathema to the Rule of Law and the Legitimacy of the Federal Courts.**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But the Biden DOJ and the U.S. District Court of D.C. have promoted an unfair sentencing landscape in which "conservative," or "anti-government" rioters receive sentences far greater than sentences for "liberal" or "pro-government" rioters.

**The Biden DOJ's break from tradition in pursuit of conservative and "right wing" demonstrators.**

After 240 years, the Biden Administration has broken starkly from America's tradition of freedom of political speech and political fairness, embarking on prosecutions expressly aimed at the Administration's political foes. While the Government, in its Sentencing Memo, preaches rhetoric about the need to avoid sentencing disparities, it is the government's own sentencing recommendations and prosecutions regarding American political protest which have caused the greatest disparities of all: the gaping disparities between "left wing" and "right wing" protestors and rioters.

Federal sentencing laws and applications which produce unequal treatment of offenders in similar situations but differing politics violates the very essence and foundation of respect for the rule of law.  Indeed, the legitimacy of Congress, the federal courts, and the United States government itself depends on the principle that when Congress enacts laws, such laws must be equally applicable.

Over the past four years, the government has treated pro-government ("left wing") rioters—who generally seek more power for government, more intrusive and expansive bureaucracy, higher taxes, and more government regulations of the environment, speech, public health, and commercial enterprise—with kid gloves; while sentencing "right wing" rioters—who seek limited government, lower taxes, and less regulation—to the max.

In the case of fellow Jan. 6 defendant Garrett Miller (before Judge Nichols), Miller's able counsel performed an exhaustive review of these disparities between the "right wing" Trump supporters of January 6 and "left wing" rioters in the Portland, Oregon and Seattle areas.

In May and June of 2020, the City of Portland was the scene of several political riots. Much of the rioting took place on a city block in Portland occupied by the Hatfield federal courthouse. The federal government owns that entire Portland City block. Portland protests were followed by nightly criminal activity in the form of vandalism, destruction of property, looting, arson and assault. The

Hatfield Courthouse and ICE facility have experienced significant damage to the facade and building fixtures during 2020.

Left wing rioters who actually obstructed and deliberately shut down official proceedings have been prosecuted for misdemeanors by the Biden Justice Department; not felonies.

**The Minneapolis/St. Paul, Minnesota riots in 2020**

## One year later, few charges for the arson and destruction

BY: **RILYN EISCHENS** - MAY 27, 2021   6:00 AM 



📷 Protesters set fire to the Minneapolis Police Department Third Precinct on May 28. Photo by Max Nesterak/Minnesota Reformer.

More than 1,000 buildings were burned or damaged in Minneapolis in the days after George Floyd's murder. Criminal charges have been filed in connection with 11 of them.

A year after ex-Minneapolis police officer Derek Chauvin killed Floyd, setting off days of peaceful protest and nights of widespread destruction, nearly 100 people have faced felony charges in connection to the unrest. Most charging documents, however, seem to describe opportunistic burglars.

A fraction of the charges describe the defendants breaking into buildings or lighting fires, according to a *Reformer* review of citations and charges from the U.S. Attorney's Office, Hennepin County, Ramsey County, the city of St. Paul and the city of Minneapolis.

Meanwhile, 95% of the 520 misdemeanor citations issued to protesters in Minneapolis have been dismissed.

As the Twin Cities were rocked by looting, vandalism and arson in the last days of May 2020, public officials placed the blame on politically motivated outside agitators. State and local leaders said organized criminals and extremists were traveling to Minnesota, taking advantage of the mass demonstrations and tensions to cause trouble.

So far, only one charging document explicitly links the accused to an extremist group, and none seem to describe especially crafty criminals. Most of the accused are Minnesota residents, with just over half living in Minneapolis or St. Paul.

**To Avoid Severe Sentencing Disparities, the Court should Avoid Sentencing Kastner to Imprisonment.**

As Garrett Miller's analysis reveals, most of the Portland rioters charged under statutes identical to those faced by January 6 felony defendants ended up with light prison sentences, probation, or having charges dropped. "Almost Half of Federal Cases Against Portland Rioters Have Been Dismissed," *Wall Street Journal* (April 16, 2021).

Below are some of the summaries of cases dismissed by the U.S. Justice Department involving the Portland riots:

1. **Portland Riot Cases Dismissed to Date**
   *United States v. Travis Williams*, NO. 20-CR-296 (D. Or.)

   After taunting law enforcement officials, the Defendant lunged toward the face and neck of a Deputy United States Marshal. When officers attempted to arrest the Defendant, he ripped the communication devices off two Marshals' vests and partially ripped the ballistic vest off of one of the Marshals. Tasering the Defendant had no affect and he continued fighting the Marshals. He then tried to break a Marshal's arm. Following his arrest, the Defendant told a jailer, "I almost ripped your buddy's arm off, I am a state wrestler."

   *United States v. Taylor Charles Lemons*, NO. 20-CR-374 (D. Or.) (Attachment 4)- Charged a Deputy United States Marshal and struck him with a shield while the Marshal was performing his official duties. When arrested, Defendant was found with a loaded pistol.

   **United States v. Thomas Johnson, NO. 20-MJ-00170 (D. Or.) (Attachment 5)-** Assaulted a Deputy United States Marshal in the face with a shield. Defendant was arrested in possession of an asp, OC spray, plated body armor, helmet, gas mask, and goggles.

   **United States v. Nicholas Joseph Bantista, NO. 20-CR-431 (D. Or.) (**Attachment 6)- Defendant had a previous conviction for

aggravated assault of a police officer in Illinois. During the Portland riots, he struck a federal law enforcement official in the head with a rock. Upon arrest, he was found in possession of a pellet gun and a nail gun power load cartridges.

**United States v. Caleb Willis, NO. 20-CR-296 (D. Or.)** (Attachment 7)- Along with two other individuals, he began punching a Deputy United States Marshal and tried to steal the Marshal's gas mask while the Marshal was performing his official duties.

**United States v. Joshua Webb, NO. 20-MJ-00169 (D. Or.)** (Attachment 8)- Struck a Deputy United States Marshal in the face with a shield and then punched him in the face while the Marshal was performing his official duties. When arrested, the Defendant was found in possession of a tactical vest.

**United States v. David Michael Bouchard, NO. 20-MJ00165 (D. Or.)** (Attachment 9)- Assaulted a federal law enforcement officer using a headlock maneuver while the officer was performing his official duties. When arrested, Defendant was found in possession of a shield and leaf blower.

**United States v. Rebecca Mota Gonzalez, NO. 20-MK00168 (D. Or.)** (Attachment 10 )- Punched a DeputyUnited States Marshal in the face while the Marshal was performing his official duties. When arrested, Defendant was found in possession of a gas mask and goggles.

**United States v. Evan Louis Kriechbaum, NO. 20-MJ00178 (D. Or.) (Attachment 11 )-** Elbowed a uniformed law enforcement officer in the face while the officer was performing his official duties.

**United States v. Giovanni Terrance Bondurant, NO. 20- CR-302 (D. Or.)** (Attachment 12)- Forcibly assaulted a law enforcement officer from behind when the office was in the process of arresting another rioter. When arrested, Defendant was found in possession of a shield and gas mask.

**United States v. Patrick Stafford, NO. 20-CR-295 (D. Or.)** (Attachment 13)- Slammed a DeputyUnited StatesMarshal with a shield allowing another rioter who the Marshal was attempting to arrest to escape.

**United States v. Taimane Jame Teo, NO. 20-CR-205 (D. Or.) (**Attachment 14)- Shined laser into the eyes of a federal law enforcement officer while the officer was performing his official duties. The officer could still see spots 15 minutes after the assault.

**United States v. Gretchen Margaret Blank, NO. 20-CR-224 (D. Or.) (**Attachment 15)- Assaulted a federal law enforcement officer using a shield while the officer was in the process of making an arrest.

**United States v. Christopher Fellini, NO. 20-CR-212 (D. Or.)**

Assaulted a federal law enforcement officer with a laser while the officer was performing his official duties, resisted arrest, and was found with pepper gel and a knife upon his arrest.

***United States v. Stephen Edward Odonnell,* NO. 20-MJ00166 (D. Or.)** Threw a hard object that struck a federal law enforcement officer in the face while the officer was performing his official duties.

**United States v.Nathan Onderdonk-Snow, NO. 20-CR-293 (D. Or.) (**Attachment 18)- Shoved a Deputy United States Marshal from behind with a shield while the Marshal was performing his official duties and resisted arrest.

**United States v. Brodie Storey, NO. 20-CR-330 (D. Or.)** (Attachment 19)- Lunged at and tackled a Deputy United States Marshal while the Marshal was performing his official duties.

**United States v. Jeffrie Cary, NO. 20-CR-329 (D. Or.) (**Attachment 20)- Attacked a DeputyUnited States Marshal with a shield while the Marshal was performing his official duties.

**United States v. Jordan Matthew Johnson, NO. 20-MJ00179 (D. Or.) (Attachment 21)-** Attempted to grab a smoke grenade and struck a Deputy United States Marshal in the head while resisting arrest.

**United States v. Jesse Herman Bates, NO. 20-CR-245 (D. Or.) (**Attachment 22)- Shot medic in the chest with a metal ball bearing. Defendant was arrested with a crowbar.

**United States v. Michelle Peterson O'Connor, NO. 20-CR00023 (D. Or.) (**Attachment 23)- Struck a law enforcement officer in the head with a helmet and "rung his bell."

**United States v. William Grant Reuland, NO. 20-CR-460 (D. Or.)** (Attachment 24)- Engaged in civil disorder by shining lasers at various law enforcement officials.

**United States v. Travis Hessel, NO. 20-CR-450 (D. Or.)-** Arrested and later indicted for civil disorder by interfering with law enforcement officials engaged in their official duties. The details are unknown because the complaint was never unsealed.

**United States v. Richard Singlestad, NO. 20-MJ-00028 (D. Or.)-** Arrested for civil disorder by interfering with law enforcement officials engaged in their official duties. The details are unknown because the complaint was never unsealed.

**United States v. Pedro Aldo Ramos, Jr., NO. 20-CR-290 (D. Or.) (Attachment 25)-** Punched a law enforcement officer in the face. Defendant was charged with civil disorder.

**United States v. Kristopher Michael Donnelly,NO. 20-CR436 (D. Or.) (Attachment 26)-** Destroyed a police station window with a hammer and forcefully elbowed an officer in the face who attempted to arrest him. Defendant also was throwing frozen eggs and other hard objects at officers. Defendant was charged with civil disorder.

**United States v. Lillith Etienne Grin, NO. 20-CR-290 (D. Or.) (Attachment 27)-** Assaulted a Deputy United States Marshall with a laser, thereby affecting his vision "for 30 minutes after the incident" that resulted in "blurry vision and 'sunspots'" for the officer. Defendant also resisted arrest.

**United States v. Joshua Warner, NO. 20-CR-442 (D. Or.) (Attachment 2)-** Assaulted law enforcement officials by pointing a laser at their eyes and resisted arrest. Defendant was indicted for civil disorder.

**United States v. Charles Randolph Comfort, NO. 20-CR290 (D. Or.) (Attachment 28)-** Assaulted a law enforcement officer by repeatedly charging at him with a shield. Defendant was indicted for civil disorder.

**United States v. Alexandra Eutin, NO. 20-CR-459 (D. Or.) (Attachment 29)-** *Struck a law enforcement officer in the head with a wood sign/shield while officer was attempting to arrest another rioter. Defendant was indicted for civil disorder.*

### 3. Portland Riot Cases with Extremely Favorable Plea Agreements

*United States v. Jeffrey Richard Singer*, **NO. 20-CR-218 (D. Or.)** (Attachment 30)- Defendant had a "reoccurring role" in the Portland riots and charged at an officer who was trying to arrest him and injured the officer's thumb. Defendant also broke several windows at a private business and stole a United States flag. Although the defendant was charged with civil disorder and theft of government property, the civil disorder charge was dismissed, and Defendant was allowed to plead to simply stealing the flag. Because the government "appreciated" the Defendant not engaging in further rioting after his arrest, it recommended a sentence of "time served" and one year supervised release.

**United States v. Anthony Amoss, NO. 21-MJ-00113 (D. Or.)**

Defendant broke a window of the federal courthouse with a rock. The cost to replace windows was over $1,000 a piece. Defendant was allowed to plead to a citation only. 7 7 In the complaint against Amoss, the government noted: "Protest events in Portland are primarily attended by people in 'black bloc," a term used to describe the all black, nondescript clothing. ANTIFA and other groups have stated that the intent of wearing 'black block' is to protect members of the group willing to take 'direct action' by making it difficult for law enforcement to identify individuals and further anonymizing them ('direct action' is most often a criminal act of vandalizing property or assaulting people)."

**United States v. Carly Anne Ballard, NO. 20-MJ-000083 (D. Or.) (Attachment 31)-** Resisted arrest by kicking a United States Marshal. Defendant was allowed to plead to a citation only.

**Garret Millier's counsel noted that, despite these serious attacks, assaults, and acts of vandalism against officers, these Portland rioters received very little jail time.** "From that review, it appears that approximately **74 persons** were charged with criminal offenses arising out of the riots. Of those 74 persons, to date, approximately **30 persons** have had their cases dismissed (often with prejudice) upon motion of the government, **12 persons** appear to have been offered dismissals upon completing a pre-trial diversion program, and at least **3 persons** have been allowed by the government to plead guilty to significantly reduced charges."

The alleged facts in the Portland cases were generally far more severe and included protestors hitting, choking, and swinging at officers with weapons.) In each case, the United States Attorneys Office (representing both Democratic and Republican presidential administrations) treated pro-Trump protestors more harshly than anti-Trump protestors.

**In most cases, the anti-Trump demonstrators had their charges dismissed!** The selectiveness of the DOJ's approach to protests, riots and demonstrations is clear. When *anti-Trump* protestors demonstrate, disrupt government proceedings and brutally attack federal officers, the DOJ usually dismisses the charges. But when *pro-Trump* demonstrators demonstrate, they are exposed to years in federal penitentiaries for merely brushing or pressing against cops or tossing a traffic cone or a water bottle.

A "large majority of the Portland rioters charged with identical offenses arising out of a "political riot" had their cases dismissed, were offered pretrial diversion, or plead to significantly reduced charges." Miller's motion, page 18. "And, unlike Mr. Miller [and Kastner], many of the Portland rioters engaged in serious assaultive conduct such as punching officers, attempting to break bones of officers, putting officers in choke holds or head locks, and alike." *Id*.

**America has a long history of political riots at State Capitols; but participants have never been punished like January 6ers.**

The same is true of **<u>state</u>** capitols, which have also been the settings for tumultuous demonstrations and protests. In 1936 an army of up to 250 unemployed men occupied the New Jersey State Capitol in Trenton for eight days in protest over unemployment and poverty.[1] In 1967, Black Panthers took over the California State capitol and actually drove out the California legislature using semi-automatic M-1 Carbine rifles. The longest sentence served in the matter was one year in jail.

---

[1] Jon Blackwell, 1936: An 'army' seizes the Capitol, The Trentonian
On April 21, 1936, for the first time since the Revolutionary War, a force calling itself hostile and insurrectionary occupied the state Capitol in Trenton. http://www.capitalcentury.com/1936.html (accessed 9/16/2022).



     In 2014, pro-union protestors took over and occupied the Wisconsin Capitol

for many days.  "Thousands of protesters rushed to the … forcing their way

through doors, crawling through windows and jamming corridors." "Protesters

ripped the hinges of an antique oak door at the State Street entrance and streamed

inside."[2] As the crowd scoured the building looking for the offending legislators,

---

[2] Marc A. Thiessen "Opinion  Democrats were for occupying capitols before they
were against it," *Washington Post*, January 14, 2021,

police sneaked them out through an underground tunnel to a government building across the street. But a Democratic representative posted on social media that the Republican senators were escaping through the tunnels, so when the senators came up into the lobby, the mob was there waiting for them.

> "The tall windows that framed the lobby were plastered with people yelling and banging on the glass," we wrote. "They were trapped. -The senators hid under a stairwell, out of view, while the police ordered a city bus to pull up in front of the building. Officers then formed a human wall on the sidewalk, parting the sea of protesters and creating a pathway for the senators to reach the bus." -Once the senators were on board, "the mob on the street began punching the windows and shaking the vehicle. … The police told the senators and staff inside to keep their heads down in case a window shattered."[3]

Police found dozens of .22-caliber bullets scattered across the Capitol grounds. The occupiers drew chalk outlines of fake dead bodies etched with [Governor] Walker's name on the floor, and carried signs that read "Death to tyrants," "The only good Republican is a dead Republican" and one with picture of him in crosshairs with the words, "Don't retreat, Reload."[4]  There were no arrests or prosecutions.

The same unfairness of outcome is manifested by the treatment of undocumented immigrants at the U.S. southern border.  Recently, migrants

---

https://www.washingtonpost.com/opinions/2021/01/14/democrats-were-occupying-capitols-before-they-were-against-it/ (accessed 9/16/2022)

[3] Id.

[4] Id.

engaged in violent rioting near Eagle Pass, Texas.  The rioters tore down barricades, smashed property, and threatened US border Patrol officers.

But federal prosecutors have declined to prosecute the rioting immigrants for any crime.  See Jim Hoft, "Judge Drops Charges Against Illegals Rioting at Border and Busting Through Fence – If They Were Conservatives They'd Get 10+ Years in Prison," *The Gateway Pundit*, May 10, 2024,

https://www.thegatewaypundit.com/2024/05/judge-drops-charges-against-illegals-rioting-border-busting/ (accessed 5/10/2024).

## JANUARY 6 CASES ARE OUT OF PROPORTION EVEN COMPARED TO OTHER RIOT CASES WITHIN THE DISTRICT OF DC.

In 1932, tens of thousands of veterans occupied and encamped on the Capitol grounds for weeks, demanding a bonus.  Protestors occupied parts of the Capitol for extended periods, disrupting Congress's ability to legislate or even hold hearings.  Although the U.S. Army forcibly cleared the protestors from Capitol grounds and 135 people were arrested, those arrested generally faced only misdemeanor charges; despite "angry packs h[olding] their ground, defiantly wielding clubs and iron bars, yelling profanities."[5]

**Antiwar Demonstrations and Riots during the Vietnam War which brought Washington, D.C. to a halt.**

---

[5] See Wyatt Kingseed, "The Bonus Army Storm into Washington," *History.net*, 6/12/2006, https://www.historynet.com/wwi-bonus-army-protest-in-washington/ (accessed 9/16/2022)

In November 1969, a thousand antiwar protestors **assembled in Dupont Circle and marched toward the Vietnamese Embassy where** their advance was blocked by a line of about 150 police officers. The police ordered the demonstrators to disperse or return to Dupont Circle.  There were "massive rounds of window breaking" and threatening police" before the police used tear gas "in an attempt to subdue the crowd." 400 F.Supp. at 192. Days later, a massive crowd blocked traffic at the Three Sisters Bridge and M Street and Canal Road.  Police stationed in the area were subjected to verbal abuse and, in a few instances, were the targets of thrown objects." Id. at 193.

In February 1970, 500 to 1000 antiwar protestors marched from the George Washington University campus toward the Watergate Apartments on Virginia Avenue, **which were chosen as a destination because several government officials lived there**. **Epithets were directed toward the police, along with small stones and other objects.** As the police followed the demonstrators back toward the streets that pass through George Washington University, some demonstrators were "throwing rocks at the police". Id. at 196. The senior police officer at the scene stated that he observed some persons attempting to overturn cars.  A group of 5000 demonstrators protesting the conviction of the "Chicago Seven," moved peacefully along the sidewalk and one side of Pennsylvania Avenue, without obstruction and "with little contact between demonstrators and police." 400 F.Supp. at 197.

Rioting continued through May 1970 when demonstrators attempted to "close down the government" until Congress surrendered to their demands to end the war in Vietnam. 506 F.2d at 97. This statement is confirmed by the "May Day Tactical Manual" issued by the organizers of the demonstration and received in evidence in federal court.

The rioters' Manual stated, at page 3 ,"The objective (of the demonstrations) is to close down all Federal government sections of Washington, D.C., by blocking traffic arteries during the early morning rush hours of May 3 and 4." The Manual identified and described in detail, with a photograph of each, and a marked street map, twenty-three "target areas" where traffic could be disrupted. It concludes (P. 24):

> We expect most of the participants to be arrested and all participants to be prepared for possible arrest. It greatly enhances our tactical position if the jails and detention facilities are filled with demonstrators . . . . If solidarity is maintained and only those who absolutely must bail out leave everyone will be released together when Mayday is over. In jail, organization and solidarity can defeat efforts to divide and control us. . . . The maximum fine levied in Washington in mass arrest situations has been $25. In most cases the fine and bail has been $10. If we maintain our solidarity we should all be released with no charges.

> "There was also testimony that some members of the group pounded on

Capitol doors and windows, painted on the Capitol walls and climbed on Capitol lamp posts."  Yet the court ordered expungement of the arrest records of members of the class who participated in any of the seven Washington demonstrations and

for whom field arrest procedures or "normal booking procedures" were not used, or against whom probable cause to arrest was not actually established notwithstanding the use of standard procedures. *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C.Cir. 1977).

**Protests which disrupted congressional proceedings formerly brought mere detentions without prosecution.**

In 2015, Code Pink protestors took over and disrupted a hearing before the Senate Armed Services Committee, screaming "Arrest Henry Kissinger for war crimes!" and carrying signs spelling out their hatred of the former secretary of state.[6] <u>No one was even arrested.</u>  In 2018, hundreds of protestors took over and disrupted the Capitol and occupied the Senate chamber and halls for hours.[7]  This lengthy occupation of the Capitol forced senators and representatives to shelter in

---

[6] Sophia Rosenbaum, "McCain slams Kissinger protesters: 'Get out of here you low-life scum',"
January 29, 2015, https://nypost.com/2015/01/29/mccain-to-anti-kissinger-rabble-get-out-of-here-you-low-life-scum/
[7]"Kavanaugh protesters arrested at Capitol, after thousands march on Supreme Court," *Fox News*, Oct. 4, 2018 ("By Thursday afternoon, Capitol Police began arresting hundreds of protesters inside the Hart Senate Office Building who raised their fists and loudly started chanting "Kavanaugh has got to go." Arrests were made after protesters began sitting down in the building's atrium, refusing to cooperate with law enforcement. In all, some 302 protesters were arrested and charged with unlawfully demonstrating in Senate office buildings Thursday, police said."). https://www.foxnews.com/politics/kavanaugh-protesters-arrested-at-capitol-after-thousands-march-on-supreme-court (accessed 9/22/2022).

place in their offices for hours.  Some three hundred protestors were arrested.[8]

They ultimately paid $50 fines.



[8] Sophie Tatum, "More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill," CNN https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html (accessed 9/17/2022).

American law has always recognized that zealous and heated protest is part of people seeking redress of grievances at the U.S. Capitol.

The May Day protests of 1971 literally tore the District of Columbia apart, causing many millions of dollars in damage.  The District saw "mass arrests,"

**Abortion Rights Protestors shut down the Capitol for Days but received $50 Fines.**

Abortion rights demonstrators destroyed barricades, stormed plazas, occupied Capitol offices and halls and defied orders to dispurse areas of the Capitol in 2020.

In the case of the Women's March, the organizers themselves publicly and explicitly admitted they were "planning to shut down the Capitol Building but the authorities were so scared" that they shut the Capitol down <u>for the organizers</u>.  Yet no charges of obstructing an official proceeding were ever levied against the organizers.





Government | Criminal | Supreme Court of the United States

**Judge sentences abortion rights protesters who disrupted U.S. Supreme Court**

By Jacqueline Thomsen

January 13, 2023 5:43 PM EST · Updated a year ago

The anti-Kavanaugh demonstrators breached the United States Capitol Building, confronted lawmakers and spat on them, destroyed property, fought with Police, and needed to be removed from Capitol Grounds before the Confirmation Hearing could continue. Despite the January 6th-style rioting that occurred, these individuals never faced Federal Indictment in District Court, but rather had charges that were ultimately dismissed.

The most severe punishment for that event was handed to a man named Tighe Barry, who at the time violated his Probation stemming two previous and separate breaches of the US Capitol Grounds. Following the Code Pink Invasion during the Kavanaugh Hearing, Mr. Barry plead guilty to his role, joking with the Judge and Prosecutor as he received a laughable sentence. Despite being charged with 18 U.S.C. 111 for his assault of an FBI Agent with a tent pole, he was punished with "Time Served," having spent roughly 10-12 hours in the DC Jail. He received a $75 fine that was eventually lowered to a mere $10. He fought against

21

Police as they dragged him bodily from the Senate chambers as he kicked and spit at Officers while he attempted to Obstruct the Kavanaugh Confirmation Proceedings.

Reuters has recently reported that federal courts have generally sentenced demonstrators who break through barriers or police lines at the Capitol or Supreme Court to small fines and a day or two in jail. One demonstrator, Jack Murphy, interrupted proceedings with chants and banners in the Senate chamber and **paid a $50 fine and was released a few hours later**.



Demonstrators gather outside the United States Supreme Court as the court rules in the Dobbs v Women's Health Organization abortion case, overturning the landmark Roe v Wade abortion decision in Washington, U.S., June 24, 2022. REUTERS/Michael A. McCoy *Acquire Licensing Rights* ↗

(Reuters) - A federal judge in Washington, D.C., on Friday sentenced three women to unsupervised probation and barred them from entering the U.S. Supreme Court's grounds during its 2023 term year after they disrupted arguments last fall to protest the high court's ruling overturning the national right to abortion.

U.S. District Judge Amit Mehta sentenced Emily Patterson, Nicole Enfield and Rolande Baker to unsupervised probation until June 30, 2023, after they pleaded guilty to breaking a law against speeches and objectionable language in the court's building.

| POLITICS

## Kavanaugh Protesters Ignore Capitol Barricades Ahead of Saturday Vote

**U.S. Capitol Police arrested 101 protesters Friday**



Capitol Police arrest anti-Kavanaugh protesters staging a sit-in on the Capitol steps hours before the vote to confirm Brett Kavanaugh to the Supreme Court on Saturday, Oct. 6, 2018. (Bill Clark/CQ Roll Call)

**By Katherine Tully-McManus**
Posted October 6, 2018 at 1:18pm





Protesters broke through Capitol Police barricades and rushed up the steps to the Capitol Rotunda Saturday afternoon amid large demonstrations ahead of a Senate vote on Supreme Court nominee Brett Kavanaugh.

The metal barricades were erected Thursday to keep demonstrators on specific areas of the Capitol grounds. Security has been heightened on Capitol

During a 3-day siege of the White House by Antifa rioters in 2020, President Trump and the First Lady were evacuated to the Presidential Bunker. The historic St. Johns "Church of the President" was burned, and the violence of a single night resulted in roughly 90 Officers being gravely injured by bottles, rocks, bricks, and fireworks being hurled at their riot lines. To date, the vast majority of those that committed these acts have never faced any penalties; civil or criminal.





## I.     DISCUSSION

While the government has "broad discretion" in "enforc[ing] the Nation's

criminal laws," that discretion is, nevertheless, "subject to constitutional

constraints." United States v. Armstrong, 517 U.S. 456, 465 (1996) (citations

omitted). "One of these constraints, imposed by the equal protection component

of the Due Process Clause of the Fifth Amendment" is that the government

cannot pursue criminal charges against a citizen that amounts to a "'practical

denial' of equal protection of law." Id. (citations omitted). Such a pursuit would give rise to a claim of "selective prosecution." Id. While "selective prosecution" claims generally involve claims of disparate treatment based upon race or religion, it is clear that a claim of selective prosecution can be based upon the disparate treatment of those espousing different political viewpoints. It is clear that discriminatory enforcement of the law, by either state or federal officials, constitutes a denial of equal protection. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915 (1968).

The primary way in which discriminatory law enforcement can be exhibited is by the use of the prosecutorial prerogative itself to discriminate against those whose constitutionally protected views or activities are not popular with the government (selective prosecution). United States v. Banks, 368 F.Supp. 1245, 1251 (D.S.D. 1973).

In all of these protests, violent demonstrations, and mass occupations of the Capitol, never has the Justice Department embarked on a wholesale crusade to find and prosecute every conceivable potential violation of federal law. "[I]n most cases, probable cause to arrest defeats a claim of retaliatory arrest." *Lund v. City of Rockford*, 956 F.3d 938, 941 (7th Cir. 2020). However, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he

was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1728, 204 L. Ed. 2d 1 (2019).

Dated: September 16, 2024                                   Respectfully Submitted,

*/s/ John M. Pierce*
John M. Pierce
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (662) 665-1061
Email: jpierce@johnpiercelaw.com

## CERTIFICATE OF SERVICE

I, John M. Pierce, hereby certify that on this day, September 16, 2024, I caused a copy of the foregoing document to be served on all counsel through the Court's CM/ECF case filing system.


/s/ John M. Pierce
John M. Pierce